USDC SCAN INDEX SHEET

















LLS    3/3/99    15:18
3:99-CV-00372    ALLEN V. ADAC LABORATORIES
*1*
*CMP.*

1  JEFFREY R. KRINSK, ESQ. (109234)
   HOWARD D. FINKELSTEIN, ESQ. (102964)       99 MAR -2  AM 10: 54
2  FINKELSTEIN & KRINSK
   501 WEST BROADWAY, SUITE 1250
3  SAN DIEGO, CA 92101-3593
   Telephone:  619/238-1333
4
   Attorneys for Plaintiffs                   BY:          DEPUTY
5

6

7

8                    UNITED STATES DISTRICT COURT
9
                   SOUTHERN DISTRICT OF CALIFORNIA
10

11
   KIRK  R.  ALLEN,  On  Behalf  of ) CASE NO. 99 cv 0372 J    RBB
12 Himself and All Others Similarly )
   Situated,                        ) CLASS ACTION
13                                   )
            Plaintiffs,              ) COMPLAINT FOR VIOLATION OF THE
14                                   ) SECURITIES  EXCHANGE  ACT  OF
   vs.                              ) 1934
15                                   )
   ADAC  LABORATORIES,  R.  ANDREW  )
16 ECKERT, DAVID L. LOWE and P. ANDRE )
   SIMONE,                          )
17                                   )
            Defendants.              ) Plaintiffs Demand A
18 _____  ) Trial By Jury

19

20

21

22

23

24

25

26

27

28

1    Plaintiffs, individually and on behalf of all others similarly

2   situated, by their attorneys, allege the following upon the

3   investigation of counsel, except for those allegations pertaining

4   to plaintiffs, which are based on personal knowledge:

5                    NATURE OF THE ACTION

6       1.   Plaintiffs bring this action as a class action on behalf

7   of a class consisting of plaintiffs and all other persons or

8   entities who purchased the securities of defendant ADAC

9   Laboratories ("ADAC" or the "Company") on the open market, during

10  the period January 10, 1996 through December 28, 1998, inclusive

11  (the "Class" and "Class Period," respectively), to recover damages

12  caused to the Class by defendants' violations of the federal

13  securities laws.

14                    JURISDICTION AND VENUE

15      2.   This action arises under §§10(b) and 20 of the Securities

16  Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§78j(b) and 78t,

17  and the rules and regulations promulgated thereunder, including

18  Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R.

19  §240.10b-5.   Jurisdiction is based upon §27 of the 1934 Act,

20  15 U.S.C. §78aa, and 28 U.S.C. §1331.

21      3.   (a) Venue is proper in this District because many of

22  the acts complained of, including the dissemination of materially

23  false and misleading statements and reports, prepared by or with

24  the participation, acquiescence, encouragement, cooperation, or

25  assistance of defendants, occurred, at least in part, in this

26  Distrist. Additionally, defendant ADAC has conducted and conducts

27  business in San Diego County and has enjoyed the privilege of

28  continuing business in this district.

COMPLAINT FOR VIOLATION OF THE SECURITIES

4.    In connection with the acts and conduct complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities exchanges.

### THE PARTIES

5.    Plaintiff Kirk R. Allen, purchased shares of ADAC common stock during the Class Period as described in the attached certification and were damaged thereby.

6.    Defendnat ADAC is a California corporation with business operations and the dissemination of misinformation occuring in this District in San Diego County.    The Company purports to design, develop, manufacture, sell and service medical imaging and healthcare information systems used in hospitals and clinics worldwide.

7.    Defendant R. Andrew Eckert ("Eckert") was elected a Director of the Company in April 1996.    In August 1997, defendant Eckert became the Chief Executive Officer of the Company.    From March 1997 until August 1997, Eckert, Eckert served as the President and Chief Operating Officer of the Company.    From November 1994 to March 1997, he served as President and General Manager of ADAC Medical Systems, and from February 1992 to November 1994, he served as Executive Vice President and General Manager of the Company's nuclear medicine business.    Eckert joined the Company in February

1  1990 and from that date until February 1992 held several other

2  senior management positions with the Company.

3      8.   Defendant David L. Lowe ("Lowe") was elected a director

4  of the Company in August 1992.  Defendant Lowe is currently serving

5  as Chairman of the Board of Directors, a position he has held since

6  March 1996.  Lowe served as Chief Executive Officer of the Company

7  from November 1994 until August 1997, as Co-Chief Executive Officer

8  from March 1994 until November 1994, and as President of the

9  Company from February 1992 until November 1994.  He joined the

10  Company in April 1988 and from that time until February 1992 served

11  in a variety of senior management positions, including Chief

12  Operating Officer.

13      9.   Defendant P. Andre Simone ("Simone") was elected Chief

14  Financial Officer of the Company in June 1996, and has served as

15  Vice President-Finance of the Company since October 1995, and

16  Treasurer since May 1994, when he joined the Company.

17      10.  Defendants Eckert, Lowe and Simone are sometimes

18  hereinafter referred to as the "Individual Defendants."

19      11.  As senior officers of ADAC, defendants Eckert, Lowe and

20  Simone were controlling persons of ADAC.  As such, each of the

21  Individual Defendants had a duty to disseminate accurate and

22  truthful information regarding ADAC and to correct any previously

23  issued statements that had become untrue so that the market price

24  of ADAC common stock would be based upon truthful and accurate

25  information.

26      12.  Defendants Lowe, Eckert and Simone, by reason of their

27  executive positions of ADAC, were controlling persons of ADAC and

28  had the power and influence, and exercised the same, to cause ADAC

1  to engage in the conduct complained of herein.   The Individual
2  Defendants controlled the contents of ADAC's SEC filings, corporate
3  reports and press releases.   Each of the Individual Defendants
4  participated in writing or reviewing ADAC's corporate reports,
5  press releases and SEC filings alleged to be misleading and thus
6  had the ability and opportunity to prevent their issuance or cause
7  them to be corrected.   Because of their positions and access to
8  material non-public information available to them, these defendants
9  knew that the adverse facts specified herein had not been disclosed
10  to and were being concealed from the public and that the positive
11  representations which were being made were then materially false
12  and misleading.   Thus, each of the Individual Defendants is legally
13  responsible for the falsifying of ADAC's public reports, financial
14  statements and releases detailed herein as "group-published"
15  information.

16                 CLASS ACTION ALLEGATIONS

17     13.   Plaintiffs bring this action on their own behalf and as
18  a class action pursuant to Rule 23 of the Federal Rules of Civil
19  Procedure, on behalf of the Class consisting of all persons (other
20  than defendants and the members of their immediate families, their
21  heirs, successors and assigns) who purchased ADAC securities
22  (including common stock and options) on the open market during the
23  period January 10, 1996 through December 28, 1998, inclusive.

24     14.   Members of the Class are so numerous that joinder of all
25  members is impracticable.   As of September 21, 1998, there were in
26  excess of 19 million outstanding shares of the Company's common
27  stock.   There are thousands of members of the Class, dispersed
28  throughout the United States, thereby making joinder of all its

1   members impracticable.   The number of Class members and their

2   addresses is currently unknown to plaintiffs but can be ascertained

3   from the books and records of ADAC.

4      15.  Plaintiffs' claims are typical of the claims of the

5   members of the Class.  Plaintiffs and the members of the Class have

6   sustained damages because of defendants' unlawful activities

7   alleged herein.   Plaintiffs have retained counsel competent and

8   experienced in class and securities litigation and intend to

9   prosecute this action vigorously.  The interests of the Class will

10   be fairly and adequately protected by plaintiffs.  Plaintiffs have

11   no interests which are contrary to or conflict with those of the

12   Class they seeks to represent.

13      16.  A class action is superior to all other available methods

14   for the fair and efficient adjudication of this controversy.

15   Plaintiffs know of no difficulty to be encountered in the

16   management of this action that would preclude its maintenance as a

17   class action.

18      17.  Common questions of law and fact exist as to all members

19   of the Class and predominate over any questions solely affecting

20   individual members of the Class.  Among the questions of law and

21   fact common to the Class are:

22        (a)  Whether defendants violated the federal securities

23   laws as alleged herein;

24        (b)  Whether defendants participated in and pursued the

25   common course of conduct complained of; and

26        (c)  Whether plaintiffs and the other members of the

27   Class have sustained damages and the appropriate measure thereof.

28

## FRAUD ON THE MARKET

18.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)   Defendants made public misrepresentations and/or omitted material facts during the Class Period, as alleged herein;

(b)   The misrepresentations and/or omissions were material;

(c)   ADAC securities were traded on the NASDAQ National Market System, an efficient market;

(d)   The misrepresentations and/or omissions alleged induced the securities markets and reasonable investors to misjudge the value of ADAC securities; and

(e)   Plaintiffs and the other members of the Class acquired ADAC securities between the time defendants made the misrepresentations or omissions and the time the truth was revealed, during which time the price of ADAC securities were inflated by defendants' misrepresentations and omissions.

19.   Based upon the foregoing, plaintiffs and the other members of the Class are entitled to a presumption of reliance upon the integrity of the market for purposes of class certification, as well as for ultimate proof of the claims on the merit. Similarly, plaintiffs and the other members of the Class are entitled to a presumption of reliance with respect to the omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

20.   ADAC designs, develops, manufactures, sells and services medical imaging and healthcare information systems used in hospitals and clinics worldwide. The Company conducts its business

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934                - 5 -

1  through two principal business units, Medical Systems and
2  Healthcare Information Systems ("HCIS"). The Company's Medical
3  Systems products include nuclear medicine systems used primarily in
4  oncology and cardiology, and radiation therapy planning systems for
5  oncology, as well as refurbished ADAC and third-party nuclear
6  medicine systems. The Company's HCIS products include radiology,
7  cardiology and laboratory information systems.

8  The False And Misleading Statements

9      21.  On January 10, 1996, defendants caused the Company to
10  announced that it would "achieve a record $71 million in bookings
11  for the first quarter ending December 31, 1995." According to the
12  Company's January 10, 1996 press release:

13      This bookings attainment represents a 61 percent increase
        over the $44 million for the prior year's first quarter.
14      Nuclear medicine equipment bookings, anticipated to be
        $48 million, will be the highest in the Company's history
15      and represent a 78 percent increase from the $27 million
        for this division in the previous first quarter.
16
        First quarter revenues are expected to be in the
17      range of $54 to $55 million -- approximately a 24 percent
        increase from the prior year's first quarter revenues of
18      $44 million. Earnings per share are expected to be
        approximately 20 cents versus 15 cents in the first
19      quarter of 1995. The Company expects to report complete
        financial information for the first quarter in mid
20      January.

21      David L. Lowe, Chief Executive Officer, stated, "A
        major factor for the bookings increase is the continued
22      strong interest in Molecular Coincidence Detection
        (MCD(TM)) which received FDA 510k clearance in November.
23      This breakthrough technology is designed to enable ADAC's
        dual head nuclear imaging systems to perform both single
24      photon emission computed tomography (SPECT) and
        coincidence imaging using the same nuclear gamma camera.
25      In our HealthCare Information Systems business, we booked
        a record $9 million. We are particularly pleased to have
26      received our first order for our new client/server
        laboratory information system, LabStat(TM). We are very
27      excited about the growth prospects our new products will
        bring ADAC in fiscal 1996.
28

1    22.  On January 18, 1996, defendants caused the Company to

2  announce the results of its operations for its first fiscal quarter

3  ended December 31, 1995.  The Company reported record revenues of

4  $55.0 million, a 24% increase over the $44.2 million reported for

5  the first quarter of fiscal 1995.  Operating income of $6.3 million

6  increased 63% over the $3.8 million reported for the first quarter

7  of fiscal 1995.  The Company achieved net income of $3.5 million or

8  $.20 per share, as compared to $2.4 million or $.15 per share in

9  the first quarter of fiscal 1995.  The Company also reported record

10  bookings of $71 million in the first quarter, a 61% increase

11  compared to the $44 million in the prior year's first quarter.  On

12  January 18, 1996, defendant Lowe, then Chief Executive Officer,

13  stated:

14        "We are pleased to report our sixth consecutive quarter
          of  increasing  revenues  and  operating  profits.   In
15        addition, ADAC's nuclear medicine business achieved $48
          million in bookings, a 78 percent increase from the $27
16        million in the previous first quarter.  We believe that
          the  strong  market  interest  in  Molecular  Coincidence
17        Detection (MCD(TM)) has significantly contributed to the
          large bookings increase. . . ."
18
          Lowe continued, "Our HealthCare Information Systems
19        business posted record bookings of $9 million which
          include our first order for LabStat(TM).  ADAC's entry
20        into the $400 million laboratory information systems
          market remains on target with the anticipated product
21        release of LabStat in midcalendar 1996.  LabStat will be
          among   the   industry's   first   laboratory   clinical
22        information  systems  designed  to  operate  within  an
          open-system client/server architecture."
23
          23.  On February 14, 1996, defendants caused the Company to
24
  file with the SEC its Form 10-Q for the Company's first fiscal 1996
25
  quarter,  signed  by  defendant  Simone,  which  republished  the
26
  Company's financial results reported on January 18, 1996.
27

28

24.    Defendants' statements regarding the Company's first fiscal 1996 quarter were materially false and misleading because defendants knew that the Company's record results and growth were attributable to the improper recognition of revenue in violation of generally accepted accounting principles ("GAAP") (FASB Statement of Concepts No. 5, ¶83) and ADAC's stated revenue recognition policy.

25.    On April 22, 1996, defendants caused the Company to announce the results of operations for the Company's second fiscal quarter ended March 31, 1996. The Company reported record revenues of $58.4 million, a 31% increase over the $44.7 million reported for the second quarter of fiscal 1995. Operating income of $7.0 million increased 53% over the $4.5 million reported for the prior year's second quarter. The Company achieved net income of $3.9 million or $.22 per share, as compared to $2.8 million or $.17 per share in the second quarter of fiscal 1995. The Company also reported bookings of $61 million in the second quarter, a 36% increase compared to the $45 million in the prior year's second quarter. On April 22, 1996, defendant Lowe, then Chairman and Chief Executive Officer, stated:

> "We are pleased that bookings were again higher than revenue, which adds to our backlog. Total nuclear medicine product bookings were $40 million in this second quarter, compared to $31 million in the comparable period a year ago and $48 million in the first quarter of fiscal 1996. We believe the reduction in bookings compared to the previous quarter may be due in part to a seasonal softening of the U.S. nuclear medicine market, as well as the usual reduction in service contract renewals experienced historically in the second quarter."

> Lowe continued, "We are proud to report our seventh consecutive quarter of increasing revenues and operating profits. In addition, there were several other important accomplishments. In March, ADAC announced an agreement

with Hewlett-Packard to develop and market an integrated cardiology information-management system. This agreement provides ADAC the opportunity to further expand its addressable markets by gaining entry into the cardiology information systems market. We believe this emerging market will grow significantly in the future. We also released LabStat(TM) with Windows 95. This laboratory clinical information system is currently undergoing implementation at three sites. In nuclear medicine, we expect to begin our clinical trials of our breakthrough MCD(TM) product at five luminary sites on schedule this quarter."

26. On May 14, 1996, defendants caused the Company to file with the SEC its Form 10-Q for the Company's second fiscal 1996 quarter, signed by defendant Simone, which republished the Company's financial results reported on April 22, 1996.

27. Defendants' statements regarding the Company's second fiscal 1996 quarter were materially false and misleading because defendants knew that the Company's record results and growth were attributable to the improper recognition of revenue in violation of GAAP (FASB Statement of Concepts No. 5, ¶83) and ADAC's stated revenue recognition policy.

28. On July 22, 1996, defendants caused the Company to announce the results of operations for the Company's third fiscal quarter ended June 30, 1996. For the quarter ended June 30, 1996, the Company reported revenues of $62.4 million, a 37% increase over the $45.6 million reported for the third quarter of fiscal 1995. Operating income of $7.6 million increased 59% over the $4.8 million reported for the prior year's third quarter. The Company achieved net income of $4.4 million or $.24 per share, as compared to $3.1 million or $.18 per share in the third quarter of fiscal 1995. The Company reported bookings of $69 million in the third quarter, compared to $48 million in the prior year's third quarter.

1   For the nine-month period ended June 30, 1996, revenues were $175.9

2   million, a 31% increase compared to $134.6 million for the

3   comparable period of prior year.  Net income for the nine months

4   ended June 30, 1996 was $11.8 million or $.65 per share, compared

5   to the prior year's net income of $8.2 million or $.49 per share.

6   On July 22, 1996, defendant Lowe, then Chairman and Chief Executive

7   Officer, stated,

8       "We are very pleased to report our eighth consecutive
        quarter of increased revenues and operating profits.
9       Strong market response to ADAC's innovative technology
        and products has resulted in market share growth. . . ."
10
             Lowe continued: "ADAC's HealthCare Information
11      Systems business continues on target with steady
        increases in revenues for both our radiology and
12      laboratory products.  ADAC's QuadRIS and LabStat
        products, based on client/server architecture, provide
13      the flexibility and expandability that health care
        providers need to serve not only a single hospital, but
14      also hospital groups."

15      29.  On August 13, 1996, defendants caused the Company to file

16  with the SEC its Form 10-Q for the Company's third fiscal 1996

17  quarter, signed by defendant Simone, which republished the

18  Company's financial results reported on July 22, 1996.

19      30.  Defendants' statements regarding the Company's third

20  fiscal 1996 quarter were materially false and misleading because

21  defendants knew that the Company's record results and growth were

22  attributable to the improper recognition of revenue in violation of

23  GAAP (FASB Statement of Concepts No. 5, ¶83) and ADAC's stated

24  revenue recognition policy.

25      31.  On November 4, 1996, defendants caused the Company to

26  announce record results for its fourth quarter and fiscal year

27  ended September 29, 1996.  For the fourth quarter ended September

28  29, 1996, ADAC reported its ninth consecutive quarter of increased

1  revenues.  The Company generated a record $64.9 million of revenues
2  in the fourth quarter, a 29% increase over the $50.2 million
3  reported for the fourth quarter of fiscal 1995.  This increase was
4  attributed to a 9% increase in service revenue and a 38% increase
5  in product revenue.  Gross profit margin increased to 39.4% in the
6  fourth quarter of fiscal 1996 from 38.7% in the third quarter, with
7  product gross margins up 2% to 40.9% over that time period.
8  Operating income rose to $8.5 million, a 67% increase over the $5.1
9  million reported for the fourth quarter of fiscal 1995.  ADAC
10  achieved net income of $4.8 million, or $.26 per share, a 69%
11  increase over the $2.8 million, or $.16 per share, reported in the
12  fourth quarter of fiscal 1995.  ADAC also reported record bookings
13  of $74 million in the fourth quarter, adding an additional $9
14  million of backlog.  For the fiscal year ended September 29, 1996,
15  ADAC reported revenues of $240.8 million, a 30% increase over the
16  $184.8 million reported for the previous fiscal year.  For fiscal
17  1996, ADAC achieved net income of $16.6 million, or $.90 per share,
18  reflecting a slight increase in total calculated shares.  Earnings
19  per share increased approximately 38% from fiscal 1995, when the
20  Company achieved net income of $11.1 million, or $.65 per share.
21  On November 4, 1996, defendant Lowe, then Chairman and Chief
22  Executive Officer, stated:

23         "We are very pleased with our strong results in fiscal
       1996.  In addition, we are delighted to have won the
24     Malcolm Baldrige National Quality Award this past
       October."
25

26         ADAC also reported strong demand for its Molecular
       Coincidence Detection (MCD) technology and new laboratory
27     and radiology information systems in fiscal 1996.  MCD is
       designed to provide significant improvements in clinical
28     imaging of the most frequently diagnosed cancers by
       enabling both single photon emission computed tomography

(SPECT) and coincidence imaging using the same nuclear gamma camera.

"MCD bookings increased from 5 units in the third quarter to 22 units in the fourth quarter," said Lowe. "Additionally," stated Lowe, "the continued momentum of ADAC's radiology information system, QuadRIS/RS(R), and the recent introduction of our laboratory information system, LabStat, are opening new markets and providing new sources of revenue for the company."

32. On December 27, 1996, defendants caused the Company to file with the SEC its Form 10-K for the Company's 1996 fiscal year, signed by defendants Lowe, Simone and Eckert, which republished the Company's financial results reported on November 4, 1996.

33. Defendants' statements regarding the Company's fourth fiscal 1996 quarter and fiscal year 1996 were materially false and misleading because defendants knew that the Company's record results and growth were attributable to the improper recognition of revenue in violation of GAAP (FASB Statement of Concepts No. 5, ¶83) and ADAC's stated revenue recognition policy.

34. On January 27, 1997, defendants caused the Company to announce record results for its first fiscal quarter of 1997 ended December 29, 1996. For the first fiscal quarter ended December 29, 1996, ADAC reported a 33% increase in earnings per share and its tenth consecutive quarterly revenue increase. The Company generated record revenue of $68.4 million in the first quarter, a 24% increase over the $55.0 million reported for the first quarter of fiscal 1996. This increase was attributed to a 10% increase in service revenue and a 30% increase in product revenue. Gross profit margin increased to 40.3% in the first quarter of fiscal 1997 from 38.4% in the previous year's first quarter with product gross margins up 3.7% to 41.8% over that time period. ADAC

1  achieved net income of $5.1 million, a 44% increase over the $3.5

2  million reported in the first quarter of fiscal 1996. Earnings per

3  share increased 33% from $.20 in the first quarter of fiscal 1996

4  to $.27 in the first quarter of fiscal 1997. ADAC also reported

5  record bookings of $82 million in the first quarter, adding

6  approximately $13 million of additional backlog. On January 27,

7  1997, defendant Lowe, then Chairman and Chief Executive Officer,

8  stated:

9        "We are very pleased to report our tenth consecutive
         quarterly revenue increase. In the first quarter, we
10       began volume shipments of our Molecular Coincidence
         Detection (MCD(TM)) product. . . ."
11
         Lowe continued, "We also made two key strategic
12    investments to further enhance our capabilities. We
      acquired Geometrics Corporation, the architect of ADAC's
13    successful Pinnacle3(TM) three- dimensional radiation
      therapy planning system. Pinnacle3 significantly
14    improves physicians ability to develop optimal radiation
      treatment alternatives. We believe that Geometrics' core
15    technology will benefit ADAC's other product lines,
      particularly nuclear medicine. In addition, our
16    newly-formed ADAC Radiology Services (ARS) division
      acquired an interest in Medical Transition Strategies
17    (MTS), a management service organization (MSO) for
      physician-driven radiology networks. . . ."
18
      35. On February 12, 1997, defendants caused the Company to
19
   file with the SEC its Form 10-Q for the Company's first fiscal 1997
20
   quarter, signed by defendant Simone, which republished the
21
   Company's financial results reported on January 27, 1997.
22
      36. Defendants' statements regarding the Company's first
23
   fiscal 1997 quarter were materially false and misleading because
24
   defendants knew that the Company's record results and growth were
25
   attributable to the improper recognition of revenue in violation of
26
   GAAP (FASB Statement of Concepts No. 5, ¶83) and ADAC's stated
27
   revenue recognition policy.
28

1    37. On April 24, 1997, defendants caused the Company to

2    announce record results for its second fiscal quarter of 1997 ended

3    March 30, 1997. The Company reported a 32% increase in earnings

4    per share and its tenth consecutive quarterly revenue and operating

5    profit increase. "ADAC generated record revenues of $70.0 million

6    in the second quarter, a 20 percent increase over the $58.4 million

7    reported for the second quarter of fiscal 1996. This increase was

8    attributed to a 23 percent increase in product revenue and a 10

9    percent increase in service revenue." Gross profit margin

10   increased to 41.4% in the second quarter of fiscal 1997 from 38.2%

11   in the previous year's second quarter, with product gross margins

12   up 4.4 percentage points to 42.9% over that time period. ADAC

13   achieved net income of $5.6 million in the second quarter of fiscal

14   1997, a $1.7 million increase over the $3.9 million reported in the

15   second quarter of fiscal 1996. Earnings per share increased 32%

16   from $.22 in the second quarter of fiscal 1996 to $.29 in the

17   second quarter of fiscal 1997. On April 24, 1997, defendant Lowe,

18   then Chairman and Chief Executive Officer, stated:

19        "In the second quarter, we booked orders of $80 million,
          which represents an approximate $20 million increase over
20        the same quarter in the prior fiscal year. Our bookings
          attainment in the second quarter is particularly exciting
21        for us, as our second quarter is a seasonally slow period
          for incoming orders in the nuclear medicine industry. We
22        are also very pleased to report our tenth consecutive
          quarterly revenue and operating profit increase."
23
     38. On May 14, 1997, defendants caused the Company to file
24
     with the SEC its Form 10-Q for the Company's second fiscal 1997
25
     quarter, signed by defendant Simone, which republished the
26
     Company's financial results reported on April 24, 1997.
27

28

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934          - 15 -

1    39.  Defendants' statements regarding the Company's second

2  fiscal 1997 quarter were materially false and misleading because

3  defendants knew that the Company's record results and growth were

4  attributable to the improper recognition of revenue in violation of

5  GAAP (FASB Statement of Concepts No. 5, ¶83) and ADAC's stated

6  revenue recognition policy.

7    40.  On July 23, 1997, defendants caused the Company to

8  announce record results for its third fiscal quarter of 1997 ended

9  June 29, 1997.  The Company reported a 25% increase in earnings per

10  share and its eleventh consecutive quarterly revenue and operating

11  income increase.  ADAC generated record revenues of $71.5 million

12  in the third quarter, a 15% increase over the $62.4 million

13  reported for the third quarter of fiscal 1996.  This increase was

14  attributed to a 16% increase in product revenue and a 12% increase

15  in service revenue.  Gross profit margin increased to 41.5% in the

16  third quarter of fiscal 1997 from 38.7% in the previous year's

17  third quarter, with product gross margins up 3.9 percentage points

18  to 42.6% over that time period.  ADAC achieved net income of $5.8

19  million in the third quarter of fiscal 1997, a $1.5 million

20  increase over the $4.4 million reported in the third quarter of

21  fiscal 1996, and earnings per share of $.30 in the third quarter of

22  fiscal 1997, an increase of 25% from $.24 in the third quarter of

23  fiscal 1996.  Operating income, net income, and earnings per share

24  were $4.8 million, $0.1 million and $0.01, respectively.  On July

25  23, 1997, defendant Lowe, then Chairman and Chief Executive

26  Officer, stated:

27        "We are very pleased to report our eleventh consecutive
         quarterly revenue and operating income increase.  In the
28        third quarter, we booked orders of $75 million, which

represents an increase of approximately $6 million over the same quarter in the prior fiscal year."

41.    On August 13, 1997, defendants caused the Company to file with the SEC its Form 10-Q for the Company's third fiscal 1997 quarter, signed by defendant Simone, which republished the Company's financial results reported on July 23, 1997.

42.    Defendants' statements regarding the Company's third fiscal 1997 quarter were materially false and misleading because defendants knew that the Company's record results and growth were attributable to the improper recognition of revenue in violation of GAAP (FASB Statement of Concepts No. 5, ¶83) and ADAC's stated revenue recognition policy.

43.    On November 5, 1997, defendants caused the Company to announce record results for its fourth fiscal quarter of 1997, ended September 28, 1997.  The Company reported a 19% increase in earnings per share and its twelfth consecutive quarterly revenue and operating income increases.  For the fourth quarter, ADAC generated record revenues of $72.5 million, a 12% increase over the $64.9 million reported for the fourth quarter of fiscal 1996.  This increase was attributed to an 11% increase in product revenue and a 15% increase in service revenue.  Gross profit margin increased to 41.6% in the fourth quarter of fiscal 1997 from 39.4% in the previous fiscal year's fourth quarter.  ADAC achieved net income of $6.0 million in the fourth quarter of fiscal 1997, a $1.2 million increase over the $4.8 million reported in the fourth quarter of fiscal 1996, and earnings per share of $.31 in the fourth quarter of fiscal 1997, an increase of 19% from $.26 in the fourth quarter of fiscal 1996.  For the fiscal year ended September 28, 1997, ADAC

reported revenues of $282.3 million, a 17% increase over the $240.8 million reported for the previous fiscal year.  Excluding the effect of a one-time charge for in-process research and development related to the purchase of Cortet, Inc., ADAC achieved net income of $22.5 million, or $1.16 per share, reflecting an increase in earnings per share of 29% over the $.90 per share recorded in fiscal 1996.  In announcing the results on November 5, 1997, defendant Eckert, then ADAC's Chief Executive Officer, stated:

> "We are quite pleased to report our twelfth consecutive quarterly revenue and operating income increase.  Most importantly, we were pleased with our progress on Molecular Coincidence Detection (MCD(TM)) this past quarter as our sales momentum increased significantly. Given our favorable multi-center clinical trial results and the recent FDA 510(k) clearance of our product enhancement, MCD/AC(TM), the outlook is positive for this exciting product."

> Eckert continued, "With respect to our multi-center clinical trials, positive preliminary results were announced by Dr. Henry Wagner at the European Association of Nuclear Medicine Congress in August.  To date, the trial has confirmed that MCD produces high rates of sensitivity (96 percent) and specificity (80 percent), which represent a significant improvement in clinical accuracy over conventional imaging techniques for diagnosing certain diseases.

> "In addition, the clearance from the U.S. Food and Drug Administration to market Molecular Coincidence Detection with Attenuation Correction in the United States clears the way for ADAC to begin receiving orders, manufacturing, and delivering this new technology to our customers.

> "Additionally, in our Medical Systems division, we further expanded our multi-vendor service business by signing a national service agreement with COHR Inc., of Chatsworth, CA.  The agreement added approximately 75 gamma cameras to our rapidly growing multi-vendor service business and will help COHR and its customers improve the quality and delivery of cost-effective healthcare.

> "Most recently, on October 28th, ADAC entered the $500 million worldwide market for refurbished diagnostic imaging equipment by completing our acquisition of Southern Cats, Inc. (SCI), of Ontario, CA.  SCI is one of

1    the largest independent providers of Computed Tomography
2    and X-ray equipment refurbishment and service.

3        "In our HealthCare Information Systems Business, we
     completed two significant contract signings for our
4    radiology information systems product, QuadRIS(TM), the
     first at Children's Hospital in Boston, MA, and the
5    second at Memorial Sloan Kettering Cancer Center in New
     York, NY. These important customer decisions illustrate
6    the progress ADAC has made with its client/server
     radiology products and the position that ADAC holds
7    because of its technological innovation and understanding
     of the dynamics of today's radiology environment.

8        44. On December 29, 1997, defendants caused the Company to

9    file with the SEC its Form 10-K for the Company's 1997 fiscal year,

10   signed by defendants Eckert, Lowe and Simone, which republished the

11   Company's financial results reported on November 5, 1997.

12       45. Defendants' statements regarding the Company's fourth

13   fiscal 1997 quarter and fiscal 1997 were materially false and

14   misleading because defendants knew that the Company's record

15   results and growth were attributable to the improper recognition of

16   revenue in violation of GAAP (FASB Statement of Concepts No. 5,

17   ¶83) and ADAC's stated revenue recognition policy.

18       46. On January 28, 1998, defendants caused the Company to

19   announce record results for its first fiscal quarter of 1998 ended

20   December 28, 1997. For the first quarter, ADAC generated record

21   revenues of $75.5 million, a 10% increase over the $68.4 million

22   reported for the first quarter of fiscal 1997. Gross margin

23   increased to 42.3% in the first quarter of fiscal 1998 from 40.3%

24   in the previous fiscal year's first quarter, primarily as a result

25   of improved gross margins in the Company's nuclear medicine and

26   radiation therapy products businesses. ADAC achieved net income of

27   $6.3 million in the first quarter of fiscal 1998, a $1.2 million

28   increase over the $5.1 million reported in the first quarter of

1  fiscal 1997, and earnings per share of $.32 in the first quarter of

2  fiscal 1998, a $.05 increase from the $.27 in the first quarter of

3  fiscal 1997.  On January 28, 1998, defendant Eckert, ADAC's Chief

4  Executive Officer, stated:

> "In addition to our record financial results, our first
> quarter had several notable accomplishments.  Most
> significantly, the U.S. Health Care Financing
> Administration decision to expand Medicare coverage to
> include positron emission tomography (PET) scans for the
> diagnosis and initial staging of lung cancer was a major
> milestone.  This coverage decision applies to both
> dedicated positron tomography scanners and nuclear
> medicine cameras with positron emission tomography
> capability such as Molecular Coincidence Detection
> (MCD(TM)).  We believe this decision improves the
> economics of MCD purchases and clearly removes one of the
> major barriers to broader utilization of MCD by our
> customers."
>
> The Company also noted three recent acquisitions in
> its Medical Systems business which are designed to
> further strengthen its refurbishing and service
> businesses.  First, the Company entered the $500 million
> worldwide market for refurbished CT and X-Ray equipment
> this past quarter through the acquisition of Southern
> Cats, Inc. (SCI).  SCI is one of the largest independent
> providers of CT and X-ray equipment refurbishment and
> service.  Second, ADAC grew its presence in this market
> in January 1998 by acquiring CT Solutions, Inc., a
> leading provider of CT equipment refurbishment and
> service.  Third, the Company recently expanded its
> existing leadership position in the nuclear multi-vendor
> refurbishment and service business through the
> acquisition of O.N.E.S. Medical Services, Inc., one of
> the largest independent providers of nuclear service and
> refurbished equipment in the United States.  All three of
> these acquisitions are anticipated to be accretive in
> fiscal 1998.

     47.  On February 11, 1998, defendants caused the Company to

file with the SEC its Form 10-Q for the Company's first fiscal 1998

quarter, signed by defendant Simone, which republished the

Company's financial results reported on January 28, 1998.

     48.  Defendants' statements regarding the Company's first

fiscal 1998 quarter were materially false and misleading because

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHA....

1  defendants knew that the Company's record results and growth were

2  attributable to the improper recognition of revenue in violation of

3  GAAP (FASB Statement of Concepts No. 5, ¶83) and ADAC's stated

4  revenue recognition policy.

5      49.  On April 23, 1998, defendants caused the Company to

6  announce results for its second fiscal quarter ended March 29,

7  1998.  The Company reported that earnings per share increased 21%

8  from $.29 in the second quarter of fiscal 1997 to $.35 in the

9  second quarter of fiscal 1998.  The Company generated record

10 revenue of $77.4 million in the second quarter, an 11% increase

11 over the $70.0 million reported for the same period in fiscal 1997.

12 This increase was attributed to a 22% increase in service revenue

13 and a 7% increase in product revenue.  Gross profit margin

14 increased to 42.6% in the second quarter of fiscal 1998 from 41.4%

15 in the previous year's second quarter with product gross margins up

16 2.2 percentage points to 45.1% over that time period.  ADAC

17 achieved net income of $7.0 million, a 25% increase over the $5.6

18 million reported in the second quarter of fiscal 1997.  On April

19 23, 1998, defendant Eckert, ADAC's Chief Executive Officer, stated:

20         "We are pleased to report our fourteenth consecutive
           quarterly revenue increase and a 21% increase in earnings
21         over the second quarter of fiscal 1997.

22         "In addition, we are particularly excited that
           revenue for our HealthCare Information Systems business
23         (HCIS) grew 29 percent, from $8.0 million in the second
           quarter of fiscal 1997 to $10.3 million in the same
24         quarter of fiscal 1998, generating operating income of
           $1.3 million.
25
           "The second quarter was marked by several major
26         accomplishments in HCIS, including receipt of the first
           three orders under the DIN-PACS contract with the U.S.
27         government valued at approximately $1.8 million.

28

1          "Our Radiation Therapy Planning (RTP) business, which is a part of Medical Systems, demonstrated continued growth due to the success of our Pinnacle3 radiation therapy planning software system. Revenues grew 71 percent, from $4.2 million in the second quarter of fiscal 1997 to over $7.2 million in the same period of fiscal 1998, reflecting our growing leadership in this segment of the oncology software market."

          Eckert continued, "We also saw a revenue increase in our newest business initiative, ADAC Multi-Modality Service (AMMS), largely due to the successful integration of CT Solutions Inc and Southern Cats Inc.

          .   "AMMS revenue grew from $1 million in the first quarter of fiscal 1998 to $2.1 million in the second quarter. As we continue to strategically grow this business, we believe AMMS will become a meaningful contributor to the company's results."

50.  On May 13, 1998, defendants caused the Company to file with the SEC its Form 10-Q for the Company's second fiscal 1998 quarter, signed by defendant Simone, which republished the Company's financial results reported on April 23, 1998.

51.  Defendants' statements regarding the Company's second fiscal 1998 quarter were materially false and misleading because defendants knew that the Company's record results and growth were attributable to the improper recognition of revenue in violation of GAAP (FASB Statement of Concepts No. 5, ¶83) and ADAC's stated revenue recognition policy.

52.  On July 23, 1998, defendants caused the Company to announce record results for its third fiscal 1998 quarter ended June 28, 1998.  The Company reported that earnings per share increased 23% from $.30 in the third quarter of fiscal 1997 to $.37 in the third quarter of fiscal 1998.  The Company generated record revenue of $83.5 million in the third quarter, a 17% increase over the $71.5 million reported for the same period in fiscal 1997. This increase was attributed to an 18% increase in service revenue

1  and a 17% increase in product revenue.  Gross profit margin

2  increased to 43.4% in the third quarter of fiscal 1998 from 41.5%

3  in the previous year's third quarter with product gross margins up

4  4.7 percentage points to 47.3% over that time period.  ADAC

5  achieved net income of $7.5 million, a 29% increase over the $5.8

6  million reported in the third quarter of fiscal 1997.  On July 23,

7  1998, defendant Eckert, ADAC's Chief Executive Officer, stated:

8      "We are pleased to report our fifteenth consecutive
       quarterly revenue increase and a 23 percent increase in
9      earnings per share over the third quarter of fiscal 1997.

10      "In addition, we are particularly excited that
        revenue for our HealthCare Information Systems business
11      (HCIS) grew 36 percent, from $7.2 million in the third
        quarter of fiscal 1997 to $9.8 million in the same
12      quarter of fiscal 1998 while operating income totaled
        $1.4 million. We now have 39 live QuadRIS(TM) sites with
13      another 28 sites in implementation.  We also recently
        marked the two-year anniversary of our first live QuadRIS
14      site.

15      "Our Radiation Therapy Products (RTP) business
        continued its rapid growth in the quarter.  Our recent
16      agreement to partner with Siemens Medical Systems, Inc.,
        enabling them to offer ADAC's Pinnacle3(TM) packaged with
17      their radiation oncology products, will enhance our
        access to international markets.  RTP revenue and
18      operating income both increased approximately 100% from
        the third quarter of fiscal 1997."
19
        Mr. Eckert continued, "In our nuclear medicine
20      business, the third quarter was marked by several major
        accomplishments.  First, the Health Care Financing
21      Administration (HCFA)'s establishment of favorable
        reimbursement rates for positron emission tomography
22      (PET) scans for the initial diagnosis and staging of lung
        cancer contributed to a sizable increase in MCD bookings
23      to 24 units.  We believe that HCFA's elimination of
        uncertainty over these rates will continue to have a
24      positive impact on MCD orders over the next year as
        healthcare institutions enter their new budgeting
25      cycles."

26      53.  On August 12, 1998, defendants caused the Company to file

27  with the SEC its Form 10-Q for the Company's third fiscal 1998

28

1    quarter, signed by defendant Simone, which republished the

2    Company's financial results reported on July 23, 1998.

3        54. Defendants' statements regarding the Company's third

4    fiscal 1998 quarter were materially false and misleading because

5    defendants knew that the Company's record results and growth were

6    attributable to the improper recognition of revenue in violation of

7    GAAP (FASB Statement of Concepts No. 5, ¶83) and ADAC's stated

8    revenue recognition policy.

9        55. On November 5, 1998, defendants caused the Company to

10   announce record results for its fourth fiscal quarter of 1998 ended

11   September 27, 1998. The Company reported that earnings per share

12   increased 26% from $.31 in the fourth quarter of fiscal 1997 to

13   $.39 in the fourth quarter of fiscal 1998, excluding the effect of

14   the previously announced one-time charge described below. The

15   Company generated record revenues of $86.9 million in the fourth

16   quarter of fiscal 1998, a 20% increase over the $72.5 million

17   reported for the same period in fiscal 1997. This increase was

18   attributed to a 22% increase in product revenue and a 14% increase

19   in service revenue. Gross profit margin increased from 41.6% in

20   the previous year's fourth quarter to 43.6% with product gross

21   margins up 4.8 percentage points over that time period. Much of

22   the product margin increase was due to continued profitability and

23   growth in the Company's two software businesses, HCIS and Radiation

24   Therapy Products ("RTP"). ADAC achieved net income of $8.2 million

25   for the fourth fiscal quarter of 1998, a 35% increase over the $6.0

26   million reported in the fourth fiscal quarter of 1997. For the

27   fiscal year ended September 27, 1998, ADAC reported revenues of

28   $323.4 million, a 15% increase over the $282.3 million reported for

1   the previous fiscal year.  Excluding the effect of one-time

2   charges, ADAC achieved net income of $29 million, or $1.42 per

3   share, reflecting a 23% increase over the $1.15 per share recorded

4   for fiscal 1997.  In announcing the results, defendant Eckert,

5   ADAC's Chief Executive Officer, stated:

6       "We are pleased to report another record quarter for our
        Company.  Our revenue and profit growth were very strong
7       in the fourth quarter as all of our major businesses
        performed quite well.  Each of our three major markets
8       are healthy and ADAC's product differentiation across our
        product lines is being well received.
9
        "In particular, our software businesses posted
10      outstanding quarters.  HCIS revenues increased to $10.6
        million in the fourth quarter, an increase of 52 percent
11      from the same period a year ago.  A number of major
        customer contracts were completed in the quarter for our
12      leading radiology information system, QuadRIS(tm), most
        notably the recently announced contract with the two
13      largest healthcare authorities in Alberta, Canada.

14      "In RTP, revenues increased over 100 percent from
        the fourth quarter of fiscal 1997.  The Pinnacle3(tm)
15      treatment planning system is now the dominant product in
        the worldwide radiation treatment planning marketplace.
16      Our momentum is quite strong, as we continue to establish
        important new customer relationships.
17
        "We also continued to build on our leadership
18      position in the growing positron imaging marketplace.  We
        shipped 18 MCD units and two C-PET(tm) units in the
19      quarter compared to 13 MCD units and one C-PET in the
        prior quarter.  Positron imaging is an exciting emerging
20      segment of diagnostic imaging and ADAC is well-positioned
        for success."

21
        56.  Defendants' statements regarding the Company's fourth
22
    fiscal 1998 quarter and fiscal 1998 were materially false and
23
    misleading because defendants knew that the Company's record
24
    results and growth were attributable to the improper recognition of
25
    revenue in violation of GAAP (FASB Statement of Concepts No. 5,
26
    ¶83) and ADAC's stated revenue recognition policy.
27

28

COMPLAINT FOR VIOLATION OF THE SECURITIES

1    The True Facts Are Revealed

2       57.  On December 29, 1998, prior to the commencement of

3    trading, ADAC shocked financial market participants when the

4    Company announced that it needed to restate its financial results

5    for the previously reported 1996, 1997 and 1998 fiscal years.

6    According to the Company:

7           ADAC Laboratories (Nasdaq:ADAC) announced today that its
            financial results for fiscal years 1996, 1997 and 1998
8           will be restated.  This restatement is a result of an
            extensive ongoing review by the Company with the
9           assistance of Pricewaterhouse Coopers (PwC) of its
            accounting principles and their historic application.
10          The Company did not file its Annual Report on Form 10-K
            yesterday and has applied for an extension.
11
            As part of this restatement, the Company will adjust
12          the timing of certain revenues over the 1996-1998 period.
            The primary impact of these adjustments will be to move
13          revenues forward into adjacent future periods.
            Substantially all of the transactions relating to these
14          revenues have been completed and the associated revenues
            have been or will shortly be recognized.  In addition,
15          certain expenses will be adjusted and re-allocated
            throughout the period.
16
            Based on the review to date, the Company believes
17          that the net effect of these adjustments will have a
            material adverse impact on the Company's fiscal 1996 and
18          1997 financial results but are not expected to have a
            material impact on its previously released fiscal 1998
19          revenue, although the effect on revenue in individual
            quarters may be material.  In addition, management
20          believes that net income for 1998 may be somewhat lower
            or somewhat higher than previously reported, depending on
21          the outcome of the ongoing review.  Additionally, the
            Company believes these accounting changes will not have
22          a material impact on the Company's future business
            prospects.
23
            After the issuance of the Company's earnings release
24          in early November, several issues concerning accounting
            policies and practices were raised.  Thereafter, the
25          Company, working with PwC, undertook an extensive review
            of these issues, particularly with respect to the
26          accounting treatment of various one-time charges taken by
            the Company as well as the appropriateness of certain
27          expense and revenue recognition practices that the
            Company had followed in recent years.  Following the
28          review, the Company will apply different revenue

1    recognition guidelines than it has followed, change the
     accounting for certain transactions and adjust certain
2    expense items.

3        58.   The market's reaction to the shocking December 29, 1998

4    announcement demonstrated the extent to which the market prices of

5    ADAC's securities had become and remained artificially inflated

6    throughout the Class Period.  By mid-morning, the market price of

7    ADAC common stock had dropped to $19-5/8 from the previous day's

8    close of $27.125, a drop of $7.50 or 28%.

9    <u>Defendants Acted With Scienter</u>

10       59.   As alleged herein, defendants acted with scienter in that

11   they knew or recklessly disregarded that the public documents and

12   statements issued or disseminated in the name of the Company were

13   materially false and misleading; knew or recklessly disregarded

14   that such statements or documents would be issued or disseminated

15   to  the  investing  public;  and  knowingly  or  recklessly  and

16   substantially  participated  or  acquiesced  in  the  issuance  or

17   dissemination of such statements or documents as primary violations

18   of the federal securities laws.  As set forth herein, defendants

19   acted with a knowing or conscious disregard for the falsity of

20   ADAC's financial statements.  In addition, defendants had motives

21   and opportunities to defraud plaintiffs and the Class and acted on

22   those opportunities.

23       60.   Defendants' statements regarding the Company's 1996, 1997

24   and 1998 financial results were materially false and misleading

25   because defendants knew that the Company's record results and

26   growth were attributable to the improper recognition of revenue in

27   violation of GAAP (FASB Statement of Concepts No. 5, ¶83) and

28   ADAC's stated revenue recognition policy.

Defendants' Motives And Opportunities To Commit Fraud

61. Defendants had strong motives to disseminate false and misleading financial information, had opportunities to act on those motives, and did indeed act to take advantage of such opportunities.

62. During the Class Period defendant Eckert sold 190,935 shares of ADAC common stock at artificially inflated prices for proceeds in excess of $3.8 million.

63. During the Class Period defendant Lowe sold 230,000 shares of ADAC common stock at artificially inflated prices for proceeds in excess of $4.6 million.

### COUNT I

Against All Defendants For Violation
Of Section 10(b) Of The 1934 Act And Rule 10b-5

64. Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

65. This Count is asserted against all defendants and is based upon §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66. During the Class Period, defendants, singly and in concert, directly or indirectly, engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon plaintiffs and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading, to plaintiffs and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was to induce plaintiffs and the other members of the Class to purchase ADAC securities during the Class Period at artificially inflated prices.

67. During the Class Period, defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the preparation and issuance of deceptive and materially false and misleading statements to the investing public which were contained in or omitted from various documents and other statements, as particularized above.

68. Defendants each knew and intended to deceive plaintiffs and the other members of the Class, or in the alternative, acted with reckless disregard for the truth when they failed to disclose or cause the disclosure of the true facts to plaintiffs and the other members of the Class.

69. As a result of the dissemination of the false and misleading statements set forth above, the market price of ADAC securities was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the representations described above and the deceptive and manipulative devices and contrivances employed by said defendants, plaintiffs and the other members of the Class relied to their detriment on the integrity of the market price of the stock in purchasing ADAC securities. Had plaintiffs and the other members of the Class known of the materially adverse information misrepresented or not disclosed by

defendants, they would not have purchased ADAC securities at the artificially inflated prices that they did.

70. As a result of the inflation of the price of ADAC securities during the Class Period caused by defendants' material misrepresentations and omissions, plaintiffs and the other members of the Class have suffered substantial damages as a result of the wrongs alleged.

71. By reason of the foregoing, defendants, directly or indirectly, violated the 1934 Act and Rule 10b-5 promulgated thereunder in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices, and a course of business which operated as a fraud and deceit and a scheme to defraud upon plaintiffs and the other members of the Class in connection with their purchases of ADAC securities during the Class Period.

### COUNT II

#### Against The Individual Defendants For Violation Of Section 20(a) Of The 1934 Act

72. Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if set forth fully herein.

73. The Individual Defendants, by virtue of their offices and specific acts described above, were, at the time of the wrongs

1    alleged herein, controlling persons of ADAC within the meaning of
2    §20(a) of the 1934 Act.

3        74.   The Individual Defendants had the power and influence and
4    exercised the same to cause ADAC to engage in the illegal conduct
5    and practices complained of herein.

6        75.   By reason of the conduct alleged in Count I of the
7    Complaint, the Individual Defendants are liable for the aforesaid
8    wrongful conduct, and are liable to plaintiffs and to the other
9    members of the Class for the substantial damages which they
10   suffered in connection with their purchases of ADAC securities
11   during the Class Period.

12                          PRAYER FOR RELIEF

13       WHEREFORE, plaintiffs, on behalf of themselves and the members
14   of the Class, pray for judgment as follows:

15       1.   Declaring this action to be a proper class action and
16   certifying plaintiffs as the representatives of the Class under
17   Rule 23 of the Federal Rules of Civil Procedure;

18       2.   Awarding compensatory damages in favor of plaintiffs and
19   the other members of the Class against all defendants, jointly and
20   severally, for the damages sustained as a result of the wrongdoings
21   of defendants, together with interest thereon;

22       3.   Awarding plaintiffs and the Class their costs and
23   expenses incurred in this action, including reasonable allowance of
24   fees for plaintiffs' attorneys, accountants, and experts, and
25   reimbursement of plaintiffs' expenses; and

26       4.   Granting such other and further relief as the Court may
27   deem just and proper.

28

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  March 1, 1999              FINKELSTEIN & KRINSK
                                   JEFFREY R. KRINSK
                                   HOWARD D. FINKELSTEIN

                                   _____
                                   JEFFREY R. KRINSK

                                   501 West Broadway, Suite 1250
                                   San Diego, CA 92101
                                   Telephone: 619/238-1333

                                   Attorneys for Plaintiffs

FINKELSTEIN & KRINSK
501 West Broadway, Suite 1250
San Diego, CA 92101
(619) 238-1333

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Kirk R. Allen ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transaction(s) in ADAC Laboratories ("ADAC") during the Class Period is/are as follows:

| # of ADAC Shares | Transaction Date(s) | Purchase/Sale Price |
|---|---|---|
| Bought . 150   27 1/2 | 8/7/ 11/19/98 | 27 1/2 |
| Sold . 150   21 7/8 | JAN 26 1999 | 21 7/8 |

5.    During the three years prior to the date of this Certificate, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws:    None

6.    Plaintiff has sought to serve or served as a representative party for a class in the following actions filed subsequent to December 22, 1995:    None

7.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __1__ day of __March__ 1999.

_____
Kirk R. Allen

# CIVIL COVER SHEET

JS 44C
(Re...

The JS-44 civil cover sheet and the information c___ned herein neither replace nor supplement the filing ___ervice of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United S___es in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

ALLEN, KIRK R., On Behalf of Himself And All Others Similarly Situated,

## DEFENDANTS

ADAC LABORATORIES, R. ANDREW ECKERT, DAVID L. LOWE and P. ANDRE SIMONE,

99 MAR -2 AM 10: 58

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **MONTEREY**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **SAN DIEGO**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.
BY:                                                    DEPUTY

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

**FINKELSTEIN & KRINSK**
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101    HOWARD D. FINKELSTEIN
(619) 238-1333          JEFFREY R. KRINSK

ATTORNEYS (IF KNOWN)

**'99 CV 0372 J    RBB**

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

securities    class action

15:00?? ??    Securities Act of 1934

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med Malpractice | ☐ 620 Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☒ 850 Selective Service Securities/Commodities/Exchange |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 810 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt Relations | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWC (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 863 DIWW (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | 28 USC 2255 | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Accommodations | ☐ 530 Habeas Corpus | | **FEDERAL TAX SUITS** | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | ☐ 870 Taxes | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | | | ☐ 875 Customer Challenge 12 USC 3410 | |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
Transferred from ☐ 5 another district (specify)
☐ 6 Multidistrict Litigation
Appeal to District ☐ 7 Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☒ UNDER F.R.C.P. 23

**DEMAND $**

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____    DOCKET NUMBER _____

DATE   March 1, 1999

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT

L46 7/2   150 - 3/2/99 BW

Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. (a) Plaintiffs - Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a Government Agency, using only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved).

(c) Attorneys. Enter firm name, address, telephone number, and attorney of record. If there are several attorneys list them on the reverse side, noting in this section "(see reverse)".

II. Jurisdiction. The basis of jurisdiction is set forth under Rule 8 (a), F.R.C.P. which requires that jurisdiction be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an X in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331 where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, and act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence and box 1 or 2 should be marked.

Diversity of citizenship. (4) (JS-44A. or C only) This refers to suits under 28 U.S.C. 1332 where parties are citizens of different states. When Box 4 is checked. the citizenship of the different parties must be checked. (See Section III below). (Federal question actions take precedence over diversity cases.)

Local Question. (5) (JS-44B only) Check this box for proceedings under local civil law.

III. Residence (citizenship) of Principal Parties (JS-44A and C only) or Remarks. (JS-44B only) This section of the JS-44A or JS-44C is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party. This section of form JS-44B may be used for remarks.

IV. Cause of Action. Report the civil statute under which you are filing and give a brief description of the cause.

V. Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action description, in Section 5 above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI. Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court (3) Check this box for cases remanded to the district court for further action. Use the date of remand and the filing date.

Reinstated or Reopened. (4) Check this box for cases reopened or reinstated in the district court. Use the reopening date as the filing date.

Transferred from Another district. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate's decision.

VII. Requested in Complaint: Class Action. Place an "X" in this box if you are filing a class action under Rule 23 F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. Remarks (JS-44A only) or Related Cases. (JS-44c only). This section of form JS-44A may be used for remarks. This section of the JS-44C is used to reference relating pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.